May it please the Court, I'm Jeff Levinger for James Dondero. The $450,000 contempt sanction in this case is controlled by three principles this Court has strictly followed, and together they require reversal. The first principle is that clear and convincing evidence is required to establish the violation of a court order, in this case that's the TRO. Second is the TRO cannot be vague or ambiguous as to what it prohibits or permits. And third, the TRO must be in effect at the time of the alleged contemptuous conduct. Now the first ground for sanctions in this case, which is based on communications with Highland employees except for shared services, fails the first and second principles. The second ground for contempt, which is based on alleged interference with stock trades, violates the first and third principles, and in no event is the size of this sanction $450,000, supported by the law or by the evidence. I'll start with the first ground concerning communications. The initial problem is that the exception for shared services currently provided to Dondero's affiliates is impermissibly vague and ambiguous. An ordinary person reading this TRO, and that's this court's standard in the Scott case and in the U.S. Steel case, would not be able to tell from the four corners of this TRO what the shared services are, who's providing them, who's receiving them, and whether they have to be mutually beneficial to both sides. But someone who was involved with all of these transactions and knew all of the history would be able to tell. Well, not necessarily, Your Honor, because the test is whether an ordinary reader reading the four corners of this TRO would be able to tell what shared services means, what it refers to, and whether they have to be mutually beneficial. The test is not a subjective test as to what Mr. Dondero may or may not have understood it to mean. In Gulf King Shrimp, didn't we say it would be relevant whether the individual themselves had moved to clarifying? Well, in this case, I submit that that doctrine does not apply because Mr. Dondero thought he understood what it meant. He thought it referred to the shared services agreements that had been in place for years and he tailored his conduct accordingly. So there was no need for him to go to the court for clarification. As it turned out, there was latent ambiguity about what it meant. Each court, both the lower courts in this case as well as the parties, took divergent positions as to what it meant. The bankruptcy court seemed to think it referred to the shared services agreements, as did Mr. Dondero. Of course, if that's the view, then it violates Rule 65D because it requires reference to outside documents. In addition, Mr. Seery, their CEO, testified that the shared services agreements were ambiguous. Now the district court, for its part, took a different approach. It said, kind of along the lines of Judge Smith, well, it refers to operational reality that Mr. Dondero knows about. Well, that violates this court's test from the Scott v. Shedler case and from the U.S. Steele case that requires an objective test, what an ordinary reader would know. Highland, for its part... The Shedler test, though, that's about what is prohibited. Here, the shared services, that was a safe harbor. That actually carved out where it wasn't prohibited. You're saying there's a vagueness, a Rule 65 defect, as to a term that was his safe harbor? Exactly, because it's part of what defines what's prohibited or permitted. In other words, it says you cannot communicate with Highland employees except as it relates to shared services currently provided. So that's, it's part and parcel of the injunctive test. He should have come in and said, I mean, I guess the difficulty I have with this first violation is that it seems like he acknowledges that he talked about settlements. And this is the whole, gee, I thought my friend, the counsel, Scott Ellington, is that his name? Ellington. Ellington. I thought he was a go-between. And then the Bankruptcy Court heard testimony from Siri saying that's completely fictitious, that has nothing to do with shared services. Let me talk about the merits, Judge Higgins, because no matter what the interpretation is of the shared services agreements, I submit to you that there is not clear and convincing evidence that it was violated. Their argument turns on 13 emails and texts. And I encourage the Court to look at those. We have. Trust me. This record is massive. Let me just give you the pages to it, because they're scattered throughout, 7599-7623, and then at 8523-8536. And I submit to you that when you look at. Is that the original TRO or is that the condemned here? Those were exhibits to the motion for contempt. And I submit that when you look at those, you'll see that Highland is highly exaggerating what they say. Six of them were not even from Dondero. They were from his lawyer, including former bankruptcy judge Mike Lynn. And the topic was clearly within the scope of the shared services agreements. He was talking about litigation support and management of outside counsel. Both of those are squarely within the shared services agreements, which you'll find at 8633 and 8660. Also, I'd like for the Court to look at footnote 154 of the bankruptcy court opinion, where the Court said, I'm not basing contempt upon communications from the lawyers, from Mr. Dondero's lawyers, because they didn't come directly from Mr. Dondero. So that covers six of those 13. I thought the bankruptcy court made reference to Mr. Dondero's concession in the January 2021 deposition that he interfered on or about December 22nd. You're referring to the second basis for the contempt, Your Honor, and that's interference with trades, and I'll go to that. All right. There's no question that before the TRO, in other words, during that Thanksgiving period, November 24th and November 27th, he did tell three Highland employees, their names were Kovitz, Pearson, and Surgent, to sell two stocks. But December 22nd was after the TRO went into effect. Correct. And here's the problem with what the Court did, and it's an objective, verifiable problem. The pre-TRO communications were reflected in a series of emails, and you'll find them at 7011 to 12, and the Court talked about that at page 14 of its opinion. The Court then took that same email and time-traveled it forward to late December 2022, and you can see that in its opinion. So when you say the Court, you mean the Bankruptcy Court? The Bankruptcy Court. It time-traveled that same email, the very same email. The District Court sorts it out and says, this comes down to a credibility call, right? He recanted, but you could disbelieve his recantation. And let me talk about that one. That's where they try to fill this gap, because it doesn't work to transport the email forward, which is what the Bankruptcy Court did. It compared page 14 of its opinion to pages 31 to page 31 in 45 to 46. That just shows it was relying on an email from the wrong time frame. Now, let's go to how they try to fill the gap. They rely upon his testimony from a deposition and from a preliminary injunction hearing in early January 2021, and he answered yes to this question. And I need to quote it, because it's very important in context. Quote, you personally instructed on or about December 22, 2020, employees of those advisers to stop doing the trades that Mr. Seary had authorized with respect to Skye and Avia. Those were the stocks. Two fatal problems with that, one with respect to the answer, and the other with respect to the question. I'll start with the answer. The answer was objectifiably and verifiably mistaken. Mr. Dondero made that absolutely clear at the contempt, and there is no evidence whatsoever of any contact after the TRO. Now, here's the problem with the question. It proves nothing, and the reason is because it asked about communications with the advisers' employees. It did not ask about communications with Highland's employees. And the difference is significant, because they admit, in their brief at page 8, and the bankruptcy court made the same point, that only Highland, not the advisers, had the authority to manage and sell the CLOs. So any instructions to the advisers' employees would have had no effect whatsoever. The instructions to them could not block or stop the trades. It had to be instructions to the Highland employees, and that wasn't what the question asked about. I think the question was very deliberately phrased. And that is why Mr. Seary had to admit that every trade in December went through. Not a single one was blocked. Not a single one failed. So based on that, I submit to you that there is not clear and convincing evidence that he violated paragraph 2D of the TRO, because he did not interfere with any Highland trades after the TRO went into effect on December 10th of 2020. And Mr. Seary admitted no trades were blocked. Now, I want to return to the communications for one moment, because I talked about the six that didn't even come from Mr. Dondero. Now let me talk about the five that did, the five between Mr. Dondero and Mr. Ellington. And I welcome the court to look at those, because four out of five were simply forwarding information about ongoing litigation. That's within the scope of the shared services agreement and within the scope of the shared services that currently had been provided. The shared services agreements talks about advice with respect to litigation support. One, he didn't ask Mr. Ellington to do anything. He was just forwarding information. One of them, he asked for Mr. Ellington to provide leadership. And the bankruptcy court said, I'm not really sure what he was asking about, but he nonetheless was asking to provide leadership. Well, if you look at the email, he was asking him to provide leadership with respect to the management of outside counsel. And that's within the scope of the shared services agreement. When he's cross-examined, he's the one who says, okay, I was talking to Ellington as a go-between, in-between role, and then he goes on to admit, I don't think that was documented formally. Well, that was part and parcel of the shared services that had currently been provided. He had been talking to Mr. Ellington throughout the period leading up to the TRO about the matters covered by the shared services agreement. So any intrusion by him relating to how he wanted the settlement to work out, going through Scott, his intermediary, you're saying that was part of shared services? Yes, because the shared services agreement, and I'm referring to page 8633 and 8660, there are two of them, and they cover advice with respect to litigation support and management of outside counsel. And when you've got several emails in which he's simply forwarding information about ongoing litigation, not asking Mr. Ellington to do anything, just forwarding it, that's within the scope of the shared services agreement. Certainly, there's no clear convincing evidence to the contrary, and that's what's required here, clear convincing evidence. You remember, Seary gets on the stand and says, that's completely fictitious. That's all in D'Andaro's mind. There was nothing, has nothing to do with running other companies. It's how we're going to settle this whole global mess. He did say that, but of course, he wasn't... But he could be credited, right? The court could credit that testimony. Well, no, because he was not there at the time the shared services agreements were entered into. He, in fact, said that shared services agreements are unusual agreements, not typical. He said they're ambiguous in places, and he didn't offer any opinion or testimony as to whether or not these, I would submit, innocuous emails fell within the shared services exception. Now, one of them was with an assistant general counsel, Mr. Leventon, and that one was simply asking for contact information about outside counsel. Again, innocuous email asking for contact information that falls within the shared services exception with respect to management of outside counsel. And then one of them was to an accountant about Mr. D'Andaro's personal documents that were housed on Highland's server, and they admit in their brief that issues with respect to the server are within the shared services exception. So, again, I would submit that none of this is clear and convincing evidence where you have to have a definite and firm conviction as to the truth that would support a very serious matter like this involving contempt. His conduct with his phone was urged as a breach, but then there was no finding as to that? Correct. That consumed a great deal of attention. It did, it did. But at the end of the day, the bankruptcy court said, I'm not going to base sanctions upon that. But it did consume a great deal of attention. And that's why it's barely mentioned in the briefs at all, because it's not the basis for contempt. A couple of quick words about the amount of the sanction. Topalian says that large sanction awards like this have to be rigorously scrutinized. And I submit to you that this $450,000 amount cannot survive rigorous scrutiny. For one thing, the proof was based on fee statements that preceded the TRO. The court clearly awarded fees based upon work that was done before the TRO. And that's improper, because sanctions of this nature have to be caused by the contemptuous conduct. Secondly, there's simply no proof that the time spent or the rate charged in many instances, well over $1,250 an hour, were reasonable. They submitted the invoices, but there's no proof of reasonableness. No testimony, no declaration, no affidavit, no nothing. And that's particularly true with respect to two of the constituents who were awarded fees, the Unsecured Creditors Committee and local council. They submitted nothing. All right. Thank you.  Mr. Levenger, you save some time for a moment. Mr. Morris. Good morning. May it please the court, John Morris, Pachulsky, Stang, Zill and Jones for Highland Capital. Context is everything. In January of 2020, after Mr. D'Andaro took Highland into bankruptcy, he was forced out by the Creditors Committee. A Creditors Committee comprised largely of pre-petition claimants, and he was replaced with an independent board. Mr. D'Andaro remained at Highland as an unpaid portfolio manager, subject to the board's oversight. As noted in this court's confirmation opinion, when the Creditors Committee refused to accede to Mr. D'Andaro's demands, he threatened to burn the place down.  And the independent board terminated him. Over the next eight weeks- All you're doing now is trying to poison the well. Why don't you get to the legal issues that are- Sure. So they do raise three issues, as counsel did. The first issue is that they claim there was no evidentiary basis for the court's credibility determination that D'Andaro interfered with Highland's trading after the TRO was entered. But that's plainly wrong. The Bankruptcy Court, in footnote 106, cited specifically to my impeachment of Mr. D'Andaro at the contempt hearing. And she made a credibility determination, which she was authorized to do. The very impeachment testimony that Judge Godbey cited in his opinion, affirming the contempt finding. Am I right? Well, you can tell me. When you moved for contempt, you explicitly said you weren't basing it on the settlement communications. Do you recall that at the beginning of the hearing? I don't specifically, to be honest with you. But I want to make sure- And then let me phrase it differently. How many of the grounds for contempt that you moved for did the Bankruptcy Court verify? Two. And those two were what? Wrongful communications and interference with the business. And what specific communication was the most wrongful, most violative? Just one. Sure. I mean, I don't know that I can- Well, you must know which one you think. I do. I mean, I've got them listed out here in detail. So, the most damaging ones are the communications- Not damaging, most violative. The clearest violation. Conspiring to enter into a common interest agreement so that they can work against Highland. Okay? When you have in-house counsel, employees, who owe fiduciary duties to a debtor in possession- I think that's a little, now I'm not being critical, but that's more flavor. What communication that he made was the one that is most violative, as in not part of his shared companies? Which one would you point to? Here's the best. It's in the record at 8536. That's what I like. Okay. So, we served a subpoena on Mr. Dondero. Okay, I'm just going to interrupt again. At 8536, will I find a statement- You're going to find Mr. Dondero sharing with Mr. Ellington his strategy as communicated with his lawyers as to how to respond to Highland's subpoena. Okay. Okay? And that was verified by the bankruptcy court and the district court, that one? Actually, no, that's the one that was not. That was my favorite. That was my favorite. But the sharing of the information between Mr. Leventon and Mr. Dondero, and he testified to this, where he testifies, I called Mr., or I sent Mr. Leventon a text message for the purpose of getting his counsel information. It's- I know, but I'm going to interrupt. Sharing information could well be within the safe harbor. It's got to be information that doesn't have anything to do with the shared companies, correct? So I just, I guess I'm asking for the best one that reflects a violation that was found by the bankruptcy court with any level of record specificity. So at 8525, you've got communications regarding finding a witness within Highland to testify against Highland. Okay. You've got Dondero instructing Ellington. He can put whatever, counsel can put whatever coding he wants on it. You've got Dondero instructing Ellington to show leadership in the coordination, not of outside counsel to pursue other matters, to coordinate Mr. Dondero's army of lawyers to attack Highland. Okay. And that would be very powerful. So 8525- And that one is- Let me just finish my question. 8525, that communication, go find a witness to testify against Highland, that is one the bankruptcy court verified? Yes, in footnote 119. Okay. And in footnote 120, the court cited to Mr. Dondero's direction to Mr. Ellington, Highland's in-house counsel to provide leadership in the coordination of Mr. Dondero's lawyers to attack Highland, right? I mean, it doesn't get worse than this, as far as we're concerned. When we learned of this, we immediately fired Ellington and Levington. We had no idea that this was occurring. This was a breach of their fiduciary duty. There is no definition of shared services. The whole vagueness argument, the whole I needed to see the shared services agreement, it's nonsense. Because there's no definition of shared services where an employee is allowed to conspire with an adversary to work against his employer. This is what Mr. Dondero was doing with Mr. Ellington and Mr. Levington. They were working together not to provide services to Nextpoint and HCMFA. One thing that they will never be able to do is connect any of these communications to the only entities that had shared services agreements. Mr. Dondero didn't have a shared services agreement. Doug Abboy didn't have a shared services agreement. None of these communications are pursuant to any written shared services agreement. And that's why when they say there's a flaw in not attaching the agreements, that hurts them even more. Because none of these communications had anything to do with the parties to the written shared services agreements. They're about Mr. Dondero. They're about his personal interests. They're about his family trusts. That's what all of these emails that the court cited to concern. And so at the end of the day, can this court really say that there's a possible interpretation of shared services that would permit Mr. Dondero to communicate with a debtor in possessions in-house counsel to act against the debtor? I say that that's just outrageous, to be honest with you. And with respect, let me just turn for a moment to the interference, because I think counsel conflated a couple of things. December 22nd is not important for purposes of the violation of 2C, which concerns communications. So it doesn't matter that the communication was not with Highland employees. The interference and 2D concerns the interference with trading activities. He didn't need to communicate with Highland's employees because it was the advisors who were expected to execute the trades. They're the ones who executed the trades. And when Mr. Seary testifies that he was able to execute the trades, he did a workaround. But that doesn't mean that there was no interference with the business. We protested immediately in writing. And so, well, records, no one's faulting your protection of the company. The question is, did this bankruptcy court identify violative context? So on the interference, am I right that she primarily relied on his own admissions, that I did it? But then that does call into concern the chronology. Did he then clarify, every time I said I did it, it was actually predating the TRO period? There's no debate about this one. I don't think that there's any confusion at all. On December 23rd, we wrote a letter. It's in the record at 7142-3. In that letter, we said, among other things, Mr. D'Andaro is telling the advisors not to execute our trades. This violates the TRO. We reserve our rights. And what did we learn? We took the deposition, we had an injunction hearing, and four times, not once, not twice, not three times, but four times, Mr. D'Andaro unambiguously admitted that he told the advisors not to execute the trades that Mr. Seary had authorized. That, in and of itself, is interfering with the business. And that's true, except, I think, before the district court, the question becomes, did he candidly say, I did violate it, then I got counsel's advice, and I understood the TRO, and I stopped during the relevant TRO period? No, I would urge the court, it's really just four pages in the record. If you look at 7708 and 7709, those, that's actually eight pages of deposition transcript, because that's from the deposition, but those two pages in the record have two very explicit admissions that are tied very explicitly to the December 22nd date of interference. Now, I cited to the letter that we sent, the other document that's very important is the December 18 email from Joe Sowen to Mr. D'Andaro, because he sends this email late in the day on Friday, just before the closing bell, and alerts Mr. D'Andaro to the trading activity that Mr. Seary wants to engage in. So there's no dispute, there's no question, nobody's going back in time, the bankruptcy court certainly made references to the pre-TRO conduct, but look at the deposition testimony, look at those two pages, and you'll see two very unambiguous admissions that he told the advisors not to execute the trades. That is the interference. At pages 8044 and 8062, you'll find two other admissions during the preliminary injunction hearing, and Judge Jernigan oversaw the preliminary injunction hearing. She heard him make those admissions during that time, and again, my questions specifically relate to December 22nd, there may be a reference  about Mr. Seary's intention to trade, but there's no question that this is, all the questions are unambiguously tied to post-TRO conduct. So we get to the contempt hearing. I asked Mr. D'Andaro, didn't you interfere with trades? And he said, before Thanksgiving, but not after. And I confront him with his prior testimony, and he says, oh, I was mistaken. And that's the moment that Judge Jernigan had the responsibility to make a credibility determination. Now, should I have cross-examined Mr. D'Andaro four times? Should I have pulled out of the record both times, both admissions from the depositions, both admissions from the preliminary injunction hearing? I don't think so. I think the judge would have gotten mad at me if I'd yielded the lily that way. I did it once, I made the point. She understood that he was changing his testimony, and she made a credibility finding. So that's really simple. That's 2D. Back up to 2C, could you speak to the Schedler decision? Sure, sure. And whether or not, you know, the exception for shared circumstances was just too vague for him to know what calls he could make, and a leadership call was okay. Show leadership is okay. So Mr. D'Andaro contends that an ordinary person reading the TRO couldn't understand it without reference to the shared services agreement. As Judge Smith pointed out, however, this wasn't an ordinary person. This is a person who, for more than a decade, sat on both sides. He was the person who signed the shared services agreements on both sides. He was the person who controlled the entities on both sides, and it made sense because those entities were working in unison. They were rowing the boat in the same direction. That's what shared services was all about. And he testified specifically that he understood that shared services took into account things like finance and accounting, legal, secretarial, bookkeeping, telecom, data and electronic system services. The purpose of the shared services agreement was so that these companies would be working together, but that wasn't the case when you get to December of 2020. His contention that he believed after a TRO was issued for the express purpose of preventing irreparable harm, that the bankruptcy court gave him a green light to secretly communicate with Highland's employees to advance his interests at Highland's expense, frankly, is offensive to me. How could that be? How could any definition of shared services allow Mr. Dondero to communicate with Highland's in-house counsel on topics such as finding a witness to testify against Highland, finding, negotiating a common interest agreement so that they could all work against Highland, objecting to a settlement that Highland had just proposed? How to respond to a subpoena that we just- If there are 2,000 other companies, he might say it's gonna help all these ancillary companies, many without even contracts, nothing in writing. I need to represent their interests in the settlement. Would that allow him to talk about the settlement? That's not the facts of this case, but I don't think so. I think in-house counsel had a fiduciary duty, and he went rogue, and he worked with Mr. Dondero against Highland's interests. I really don't think it's more complicated than that. You know, that's what they're doing, is this was a moment in time he'd just been fired, he'd just had a TRO put against him, the bankruptcy court had just approved a disclosure statement that called for the asset monetization plan, right? This was a very tense moment, I will tell you. And I think you asked a great question earlier. If you had any question, why don't you just go to court? Because he did just that. He actually did make a motion, and he asked the court for permission to talk about the pot plan. He withdrew it, and then his defense here is, I thought we were talking about settlement. Well, if you thought you could talk about settlement, then why did you make the motion for permission to talk about settlement? He knew he couldn't do that. None of this. Did you cross-examine him on whether he'd actually read the TRO? I did, extensively. And it turns out he didn't read it. He wasn't in the courtroom when the TRO proceeding took place. But his counsel actually brought out that even though he didn't read the TRO, counsel advised him on the substance of the TRO. And that was the basis for, I think, the first prong where the enjoined party must have knowledge of the court's order. And I didn't do it, but Mr. Dondero and his lawyer put into evidence that he was very, that he understood the TRO, even though he hadn't personally read it. He'd gotten legal advice on the TRO so that he understood what it meant. So there's no dispute about that. Why don't you, while you have time, please address the suggestion that the amount that was awarded covered some work that was done before the TRO? Thank you very much. I was just about to turn to that. And this is really simple, okay? When we filed our motion, we put in our invoices for December and January. Our invoices are segregated by subject matter, broad subject matter at that time. And at that time, we had what we called a code called BL, bankruptcy litigation. And so anything we did that related to bankruptcy litigation as opposed to drafting the plan, as opposed to objecting to claims, went into the category of BL. So we put into evidence our invoices for December and January for BL. It starts on December 1st, before the TRO even starts. We understood exactly what was happening, right? But we were giving the court the full record of our time. And what did the court do?  She went through each of the invoices and cherry-picked those entries that related to the TRO and the contempt. And that's why if you add the two bills together, she found that $366,000 was attributable to the work done in those two months with respect to these matters. But the total bill was $1.25 million, right? So that proves the meticulous approach that the court engaged in to get to its best understanding of what the fees were, okay? So- In answer to the question, are you saying that the amount awarded did not cover any work done before the TRO? Yes. It's very simple. I mean, Judge Jernigan said that herself. And then what she did, because this matter wasn't heard for some time, we didn't submit time records for February and March, and she very, very conservatively gave us credit for 10 hours of my time to prepare for the trial and 10 hours of my paralegal at our regular hourly rate. She gave me, she gave us 10 hours for my time to do the trial and 10 hours for my paralegal. We didn't get a dollar for anybody else who worked on this. We didn't get a dollar for anybody beyond that. This was the most conservative, I mean, if anybody should be upset with the award, it should be us, because it is extremely conservative when it comes to our work. And then she added $50,000 for local counsel, for creditors committee counsel, for the cost of transcripts, and there were a lot because we took a lot of depositions and the rest of it. And keep in mind that Judge Jernigan was fully familiar with the lawyers, with their hourly rates. We had been in her courtroom for a year and a half. She had approved quarterly fee applications. She knew who we were. She had previously reviewed our bills. She was staring at two invoices that had contemporaneous detailed time records, right? So this isn't something new to her. She knew who committee counsel was. She knew who my local counsel was out in Dallas. All of this was very much within her discretion. And I think if anything, she should be commended for taking such a conservative approach, because frankly, it doesn't remotely come close to the amount of time that I spent prosecuting this particular matter. Unless the court has any other questions, I am grateful for your time. All right, thank you, Mr. Morris. Thank you, Levinger for Rubato. I'll start with the three communications that counsel talked about, because they actually support my position. Counsel cited page 7617, which deals with a common interest agreement. I welcome the court to look at that, because that's a communication between and among lawyers. Mr. Dondero's name does not appear on page 7617, on the email on 7617. And in footnote 154, the bankruptcy court declined to base contempt upon lawyer communications with Mr. Ellington that did not directly involve Mr. Dondero. So that takes care of 7617. Counsel cited 8525. That's exhibit 49, which the court said in footnote 154 is not the basis for contempt. Why? Because Mr. Dondero was not part of that communication. Again, it's communications between lawyers. That was about finding a witness? That one was about, yes, finding a witness. And the court in footnote 154 declined to base contempt upon the finding a witness emails because they did not directly involve Mr. Dondero. Counsel cited page 8536, which was communications between Mike Lynn, the bankruptcy lawyer, and others. It started with an email from Mr. Morris's partner. And Mr. Dondero simply forwarded it to Mr. Ellington without any request or comment. So- That was a discussion of strategy, apparently. That was a discussion of information on Mr. Dondero's phone and whether it's privileged. So again, that falls within the shared services exception concerning IT, concerning legal services. I wanna talk about this alleged impeachment with respect to the stock trades. Counsel rightly cited to page 7708 and 8804, but we need to look at the question because the question proves nothing. The question asked whether he instructed the advisor's employees. He should have asked, did you instruct Highland's employees? And the difference is critical because if you look at the bankruptcy court's opinion on page nine, the court said, the allegation is that Dondero was exerting pressure on certain of the debtor's employees to halt trades. And the bankruptcy court says, to be clear, the advisors have no contractual right to do that. They are not party to the portfolio management agreement that Highland has with the CLOs. But it doesn't seem to matter to me to whom he was communicating if in fact he was communicating to anyone that that person should not execute trades or that trades should not be executed. Judge Smith, paragraph 2D of the TRO, which is the subject of that particular allegation, talks about interference with Highland's business in terms of selling assets, among other things. And my point is simply, and the bankruptcy court said this, the advisors have no power to sell assets. The advisors have no power to block the sale of assets. So when counsel sort of deliberately framed the question in terms of communications with advisors' employees, it was a meaningless question because the advisors have no authority or power, at least according to the bankruptcy court, to make trades or block trades. So there could be no interference under paragraph 2D if you're talking to people who have no power to do anything, as the bankruptcy court itself said. So, and that's separate and apart from Mr. Nandera, I think very clearly saying on the record, look, I was just confused as to time frame. Yes, I had communications with the Highland employees before the TRO, but I unequivocally did not have communication with Highland employees after the TRO. And that's true. You will not find any emails, texts, letters, phone calls, and importantly, no testimony from any Highland trader like Mr. Kovitz or Mr. Sergent. None of those people testified and said that Nandera told me after December 10th of 2020 to block trades. No evidence that whatsoever and certainly no clear convincing evidence. Finally, as to the amount of the sanction, both the bankruptcy court and the district court thought that fees were being awarded pre-TRO. The bankruptcy court said it. The district court thought so too, but the district court thought it was correct. It's not correct. You cannot award fees before the TRO. Are you saying that the December invoices were not called to eliminate work done or dates shown before the TRO? That's what I'm saying, Judge Smith, because the December invoice covered November time. And so you've got all of November time. In fact, the January invoice covered December time and 10 days of which, or 9 days of which, preceded the TRO. And none of that was called out, and there's no evidence from the bankruptcy court's opinion that the bankruptcy court did call out pre-TRO time. All right, thank you, Mr. Levenger. Thank you. Last case for today, QBE.